Alexander Cashin, the only other party in this case before the district court, did not file a brief, did not contest the petition for certification below, and I have to confess I was not surprised that Mr. Cashin did not file a brief in this case. I was surprised that the government did. How can we discern? He is not. I would recognize his counsel. I would recognize Mr. Cashin. We don't know, the court doesn't know, in fact, whether Mr. Cashin is still alive, whether he still has counsel, whether they're still pursuing this case, whether he still enjoys the support of political forces in Russia that basically drove this case from the beginning. Is any of that relevant? It is relevant because we know what Mr. Cashin wants from this court because, number one, of his absence. I would consider that a procedural default. He has acknowledged to this court by not appearing and defending the case below that he's happy to see this court reverse this case. Number two, we know in the record that Mr. Cashin's counsel, at least, wants to have Mr. Kent certified as acting in the scope of his employment. He said so in a boarded press conference that he held on December 6, 2002, in Moscow, expecting Congressman Curt Weldon to join him, and he said that there is no private insurance in this case. Therefore, the only remedy for Mr. Cashin is for there to be a private bill from Congress giving him relief in this case. That is what Mr. Cashin and his counsel have been pursuing from the beginning of this case, and that only will happen if the United States acknowledges or the court finds that he's acting within the scope of his employment. And the United States … Now, if he's acting within the scope, if we were to reverse, then the United States is substituted in and would be liable under the FTCA. No, Your Honor. Or would be found liable under the FTCA. No, Your Honor. The United States would have the case dismissed against it under the foreign country exception, which the Supreme Court now has upheld as applying to this case and every other case arising in a foreign country. So Ms. Martin will leave this case with a win, regardless of what this court does, because the United States, if this court reverses, is immune in the trial court … Because the FTCA procedures weren't followed in the first place, sir. So it's because the FTCA specifically has a statutory preclusion of a suit against the United States for injuries arising in a foreign country. And there used to be what's called a headquarters claim, where people would attempt to use the FTCA. But the Supreme Court, actually following some precedent of this court, concluded recently that the foreign country exclusion is clear and would apply to this case because the United States has not waived its sovereign immunity. And Mr. Kent enjoys the same immunity that the United States has. And the analysis in this case that I think the court should apply is the following. This is not a case for controversy. That's what this court's job is to do, is to decide cases, not to engage in intellectual exercises or to tell Judge Burns, who I'm sure would tell the court that he did his very best in this case, to tell Judge Burns he was right or wrong. Why is this not a case for controversy? It is not a case for controversy because there is no one telling this court what it wants, and there's no one who will be harmed … I'm afraid, I confess I'm embarrassed. I may have missed something. Did you file a motion along these lines? Your Honor, we did not know when we filed our brief who was going to appear in this court, whether it be the United States or whether it be Mr. Cashin. Now, the United States below appeared and filed an opposition to the petition for certification. The Federal Tort Claims Act only requires that the United States attorney be noticed as to the petition of certification. What the United States then does after that is up to it. The United States made no motion to intervene. They explicitly went to great pains to say in answering the petition that we are not a party in this case. They stated that in a motion asking the trial court to delay ruling on the petition. So Mr. Cashin wasn't going to participate in this case? When he didn't file his brief. How long ago was that? It was probably 18 months ago. Did you file a motion or anything in our court on the ground that you're now advancing no case or controversy, procedural default, abandonment? Yes.  We raised it in our reply, Your Honor. In our reply, that's the first thing that we discussed, and we cited two cases from this court and a Supreme Court case, which indicated that the three elements of a case for controversy do not exist in this case. The United States cannot stand in the shoes of Mr. Cashin, and it doesn't purport to in this case. Well, in the Supreme Court case, they commented on that. They said they, as I recall, whatever the Supreme Court case is, they commented on wondering why the United States would take a position. But they didn't find the case moot. They proceeded to decide it. That's because in that case, there was an interest that the court felt needed to be protected, and the United States was in a position to adequately protect it. In this case. What was that? What did they need to protect in that case? Your Honor, I have to confess I can't address the details of that case. In looking at this, we cited three cases, and all I can rely upon with respect to Your Honor are the three elements of the test of the case of controversy. And I apologize for not being able to respond in connection with the Supreme Court case we cited. But what I can say here is that the analysis is to ask Ms. Martin, why is the United States here? Does the United States want Mr. Kent to be certified and the case dismissed against Mr. Kent and the United States, or does the United States want Mr. Kent to be exposed to personal liability in this case? In its brief, the government has said only to the court, quite explicitly in footnote one, we appear here only to defend the decision of the district court. This is not a mandamus action. I know trial judges would love to have counsel argue their position before this court, but the United States can't do that. And so I think the proper resolution of this case is for this court to say that there is no case As far as we know, Mr. Cashin, from the record before us, wants Mr. Kent to be certified so that he can attempt to get a private bill in Congress using the influence that he claims to have with the Russian Duma. The record indicates that his counsel claims that the Prime Minister of Russia has raised this issue with Colin Powell, raised this issue with the President, and that he expects once the State Department and once the government acknowledges that Mr. Kent is acting within the scope of employment, the attorneys will then go to Congress and get what Congress often does, such as what Congress did in the Kenyon bombing case. All right. But I'm just, okay. So your client, however, did follow the FTCA procedures of petitioning for review of the Attorney General's decision not to certify Mr. Kent. My client followed the procedures. The government did not. You filed the petition. We filed the petition. In the district court. In the district court, and we served the U.S. Attorney. Okay. Now, the Federal Tort Claims Act does not provide party status to the United States when a petition is filed. The purpose of service is simply to allow the U.S. Attorney to know what's going on in his or her district. But it would seem odd that the government wouldn't defend its decision. You're asking to set aside the decision that the government made, and you seem to find it odd that they wanted to contest that and defend their decision. Your Honor, in this case, I don't think that it is odd. Because what is supposed to happen is the State Department, when the first lawsuit is initially filed, and in this case was filed in Philadelphia, the U.S. Attorney and the U.S. Attorney in that district are obligated to determine whether the employee was acting within the scope of his employment under the U.S. Attorney's Manual and the Code of Federal Regulations. And they were obligated to contact the State Department for the State Department to make a recommendation to the Department of Justice and a decision to be made on the spot. What happened in this case, and this is in the record, is that Ms. Buccino, I believe her name is, who was defending the case in Philadelphia, had a telephone conversation with Kevin Gleason, who handled tort matters for the Department of State. And based only on his knowledge of the case being in the media, and not consulting with Mr. Kent, where his counsel simply said, oh, he's not within the scope of his employment. And the government answered the suit, and in its answer stated that Mr. Kent was not acting within the scope of his employment, and attached what I believe was a letter from Mr. Gleason to that effect. None of those procedures were followed. We've taken over half the time, and I don't know that this is your best point, but I would think you would want to get to the merits as to whether the certification should or should not occur. Half your time is gone already. Well, Your Honor, in Pelletier v. the Federal Home Loan and Bank Board, in my view, set out a matrix that can be used in this case. And in that case, Your Honor ruled before the Supreme Court in Lomano, Your Honor and other members of the panel, that a plaintiff who wants to challenge a certification may do so, even though the statute doesn't say so. And you ruled that, and the Supreme Court later ruled that as well. And the reason for that Your Honor gave is that the immunity provisions of the Federal Tort Claims Act should be broadly construed, and they should be broadly construed in the case of Mr. Kent in order to afford him the protection of his employment that he has promised when he goes overseas. And then the second thing that Your Honor indicated in that case that I think is of significance is that in looking to California law, Your Honor drew the same conclusion. The Court drew the same conclusion, and that is that the California law of respondeat superior should be broadly construed. And the standard that was adopted from the California highest court is that it should be broadly, any conduct broadly incidental to the enterprise of the employer is within the scope of employment. Or if there is a substantial deviation from that, then it's not within the scope of his employment. And the enterprise analysis that the California courts applied, that Your Honor applied in Pelleter, says what is the agreement that exists between Mr. Kent and his employer as to the scope of his employment? The case that I would ask the Court to look to is Hinman v. Westinghouse, California case 1970, in which the employee was paid for the time or paid to drive back and forth from work to home while a job was still going on. And applying the enterprise theory to that case, California Court of Appeals said that there is an incidental benefit to the employer, and we should infer that there is an agreement between the employer and the employee that the conduct of this employee going back and forth is within the scope of his employment unless he departs substantially from that. Now, when Mr. Kent and when anyone else joins the Foreign Service, the agreement that they enter into with the Department of State is set forth in the Foreign Affairs Manual. It's set forth in their training. It's set forth in the regulations having to do with their medical status. It's set forth in the regulations saying that their conduct is covered 24-7. And in the statute, in the regulation that says they're on duty 24-7, the State Department comments that the position of a Foreign Service officer is unique. It is unique. It is not like anyone who is commuting from Pasadena into L.A. Is there anything that's not covered? Absolutely. The scope of employment is defined by, in our view, the diplomatic immunity that the government certifies Mr. Kent enjoys when he goes overseas. And it's defined by the FAM regulations. And it's defined by the regulations having to do with what is a business use for a consular at post. Now, Mr. Kent, there is no floodgate problem here because Mr. Kent is the only person in Vladivostok who is entitled to business use for any travel. Judge Trott's question is, what acts of a consul are not covered under his agreement with the government? I can hypothesize that an act of a Foreign Service officer which does not fall within his diplomatic immunity would be outside the scope of his employment. And such an act, for example, would be an act which arises out of a Foreign Service officer running a coconut plantation on the side in the country where he is accredited to, and there is some criminal activity that arises out of the operation of the coconut operation. Are you making a distinction based on, say, criminal law or intentional conduct? What is your distinction? Because I have a hard time getting over to the gym. Getting over to the gym? Yeah, because he was not driving back and forth between work, which is what arguably, I think, would be within the scope in this context. He was off to the gym. If Mr. Kent, and Mr. Kent has periodically been stationed in Washington, D.C. If he were stationed in Washington, D.C., and if he were driving his own vehicle to the gym and was in an accident, that would not be within the scope of his employment because that is not a defined business use under the regulations of the Department of State. When Mr. Kent goes to Vladivostok, before he goes, his employer says to him, all travel, whether you are in an official vehicle or in your own vehicle or anybody else's vehicle, all travel to the gym or home or otherwise is a business use. And the reason that the State Department does that is because it recognizes the risks associated with driving vehicles in foreign countries, and it does not want its principal mission officers or ambassadors driving vehicles in Kenya and in Russia, where there are no lights and where the police system is corrupt, and any other country where the risks of the road are great, and when you have an automobile accident, people come out of the forest and kill you. Where does it say that all driving is business use? It says it in the FAM regulations. It says it quite explicitly. Read it explicitly. I shall, Your Honor. You're referring to that section, number 20 of the FAM 4377, primary offenses and penalties? 6 FAM 228.2-1. Is it in the exit record? It is, I'm sure, but I have a note here. Any transportation of consulate general is considered business use? Yes, sir. 6 FAM 228.2-1. Yes, sir. And it starts off by saying that the caption for that regulation is business use? Business purposes. Business purposes. And that's the point. Any transportation of consulate general is considered business use. That's correct. And then 228.10 provides that he may use a private vehicle for any transportation. And, Judge Wardlaw, I think it's, to me, I think that your healthy skepticism about this case, which I think is born of thinking about people working in California and Washington, D.C. Not really. Well, I think it gets trumped by this. It's not, really. I mean, I understand the scope of what you're talking about. And I understand your argument to be that his respondent's superior scope ought to be coextensive with the scope of diplomatic immunity. Well, but I've heard Your Honor's concern, obviously, before. And so I've given it some thought. And what occurs to me, I've heard Your Honor's concern from other people talking about this case. The question about going to the gym. Right. Oh, okay. So you're ready to answer that. Right. The question about going to the gym. Now, he could go to the gym in an official vehicle. He could be in an official vehicle every time he goes anywhere in Vladivostok. And I can tell Your Honor this case is notorious. And now consuls everywhere ride in the official vehicles. They don't drive anymore because of this case. So they stopped trying to save the government money? Exactly, Your Honor. Exactly. And to me, the California test, the enterprise test, the foreseeability test. Would your answer be any different under the restatement? I also thought of that question, too. And I think the restatement can be viewed as being narrower than the California law, if it can be permitted to be used in the way that the trial judge and the government has used it in this case. But the test, which is rejected by California state courts, Lisa M., of the motivational purpose, the motivational purpose under the restatement, clearly is met here. Mr. Kent's motivation in using his own motor vehicle was to do what the budget and fiscal officer told him to do, save money. And Mr. Kent, as part of this agreement that he entered into with the Foreign Service, knows that he's up or out if he doesn't do well in his engagements as a Foreign Service officer. And one of the things that is in the record is that he must demonstrate that he can make good use of scarce resources. And while it wasn't an order the government maintains, it nevertheless was an act on his part to further the interest of his employer. Why shouldn't we use district of Columbia law? That provides one uniform national standard. Well, the Department of State actually, and the Department of Justice actually, in many cases, might choose to do that at the point where they're determining whether they're going to scope an individual because it's the most convenient way to deal with the issue. And I've negotiated with lawyers for various different federal agencies about that. And the answer to Your Honor's question is they can do that because so far their decision in that regard is unreviewable. If you take a look at the Tarpedo case, which I handled. But this court can't say that we should use the law of the District of Columbia because under Erie v. Tompkins, Mr. Kent has the right to have his state law applied. And because this court in the Meredith case and the case involving whether Antarctica was a foreign country, has said in both of those cases that we're not free to invent a law to apply to, for example, torts which occur in Antarctica, which this court has concluded and Judge Scalia believed as well, does not constitute a foreign country. So we're not going to make up a law for Antarctica. And we're not going to make up a law as indicated by the Ninth Circuit in Wilson v. Drake and Smith v. U.S. We're not going to make up a law just to make sure that somebody has a remedy. In the Wilson v. Drake case, a 1996 case out of this circuit, the district court, I think it's easy to suggest, went wild. Because the district court concluded that application of the Federal Tort Claims Act immunity to the physician there that had committed malpractice on a child was unfair to the plaintiff. And although he found that the certification was proper, he felt that California law could be hypothetically expanded to allow this case to go forward. And this court actually had to enter an order in joining the district court judge from going forward with the trial of that case, because the defendant physician in that case was entitled to a broad construction of the Federal Tort Claims Act in terms of whether he enjoyed immunity. And then this court found that he did indeed enjoy immunity. And the court said that we're looking at the issue from the wrong end of the tube. The issue is not finding a remedy for someone who's injured by the conduct of a Federal employee. That's not the issue. The issue is looking at the agreement that the employee enters into with his employer when he becomes a Federal employee. The question is certification. And we're looking at that agreement. Why shouldn't the court, why shouldn't District of Columbia law apply to whether the government should certify or not? Well, if District of Columbia law were to apply, there'd be no question that he'd be scoped. But my answer to that has to do with the Supreme Court discussion in Richards v. United States, which is a Federal Tort Claims Act case. And it said, you know, look, we're not going to create a Federal common law. We're not going to try to — No, no, I didn't say Federal common law. I understand. What the court said is, look, the Federal Tort Claims Act was created with the understanding that the United States would be liable in the same fashion in which an individual under like circumstances would be liable. And the Supreme Court said, Congress set up a vehicle to allow for the application of state law. And it's not appropriate for a Federal court to say, in Richards, I believe, that had to do with which state's law was going to be used. It's not appropriate for the court to say, okay, we're going to pick this state or we're going to pick this state or we're going to pick this state. In the Richards case, the court said, we have to look to the choice of law of the forum state, not to our own ideas as to whose law should be applied, because we know that the choice of law that individual states select to use can vary. And the Supreme Court even acknowledged that some states in their choice of law rules evaluate the interests of the other state. So the answer to Your Honor's question is the Supreme Court says, no, you can't just pick a state. You have to use, in this case, the choice of law. But that's in a different context. This is a question of certification. The question is the interpretation of the relationship between your client and Federal government. That arose in the District of Columbia. I don't see any problem at all with using the District of Columbia in the targeted area of trying to figure out what the certification covers. But isn't the District of Columbia law the same as the restatement? No. Is it broader? It's much broader. And intentional torts are very broadly construed. I think that this court, the California courts, have been struggling with intentional torts in the sexual assault context. And it looks to me as if California is backed away from, I believe it's the Mary Ann case, and basically is finding that intentional sexual assaults are outside the scope in California. But the premier case in the District of Columbia involves a laundromat where a fellow who sweeps the floors chased somebody out and shot him. What does California have to do with this case? California has to do with it. Mr. Kent is a resident of the state of California. He wasn't at the time of the accident. Yes, he was. At the time of the accident? He has always been a citizen of the state of California. And the government... In this case, you wouldn't be unhappy if we chose District of Columbia law from what you said. Well, I wouldn't be unhappy, but I think it's intellectually unsupported by the theory of Erie v. Tompkins. Mr. Kent... Let's go back to what Ted Stott just said. This is a dispute over certification. What does the arrangement between your client and the government cover? Yes. Why is it improper to apply District of Columbia law where that arrangement was made? Because this lawsuit is in California, where Mr. Kent resides. It could not be in the District of Columbia. So when we take a look from the discipline of our legal education as to what law we choose, I cannot conceive of a defensible intellectual approach to a case here in California where Mr. Kent is entitled to the benefit of his law to allow the court in California to use District of Columbia law. Are you construing a contract made in the District of Columbia? Do you think it's improper to use District of Columbia law to construe that contract? No, but this isn't... It's a federal government and a federal employee. This is not a contract case. This is a tort case involving the scope of employment of Mr. Kent.  It is, Your Honor. And when you say that the dispute is over certification, and again, I'm coming full circle, I don't agree with the court that there's a dispute. Well, you know, you have not filed a motion to dismiss on the ground that there's no case of controversy. You have a lot of loose language at the beginning of your reply brief sort of referencing this, but then you go on to ask that we reverse the district court. That's what I was getting at earlier. It was sort of surprising to me that it seemed you were arguing in the nature of a motion to dismiss this case that there's no case of controversy. Did you ever file a specific motion to that extent? I did not, and I would not, quite frankly... That's what I thought I missed when you opened up with that. No, sir. And I quite frankly would, if... I can't say that it occurred to me, and I quite frankly, from a procedural standpoint, might not do that because there are more issues in this case. Let's not waste any more time on it. You're now 10 minutes overtime, so... You're withdrawing any suggestion that there's no case of controversy? I'm not, Your Honor. We've raised it in our reply. You just would like us to know that. You don't want us to take any action based on it. I do want the courts to take action. But if we took action, then the district court's decision that you're challenging would remain. No, I don't agree with that. You'd want that vacated. But you just said there were a lot of other issues and a lot of other things, and that's why you weren't making that motion. I have to confess it did not occur to me to make that motion. It did occur to me to wonder what the United States is going to say in response to my reply. Well, we'll find out. Thank you very much. Okay. I did ask them, Your Honor. Okay. Good morning. Dana Martin for the United States. Well, that was quite a segue. And our answer is what Judge Reinhart alluded to. I mean, we thought that since it was a determination of the Attorney General, we should explain why we think it was correct. If the court would rather treat us as amicus, that's fine with us, too. We have been dismissed from the litigation below. We were in the case when it first was brought in the Eastern District of Pennsylvania and were dismissed at that time under the foreign country exception to the FTCA. If the court were inclined to — Mr. Cashin hasn't even filed a position statement. That's right, Your Honor. And if the court were inclined to procedurally default him, we would have no objection to that. But if the court is inclined to reach the merits of the issue, we would ask that the district court be affirmed because we think the district court got it right. On our own motion, we sometimes have to look at whether there is a case or a controversy. Is there one or not? Well, I mean, when I looked at that question, I thought it was — what I thought of was, you usually think in terms of the appellants, whether he has standing to bring the appeal, and I thought that Mr. Hannon certainly did, whether — And what is our jurisdiction? Just the general jurisdiction statute? I think — well, it's an interlocutory appeal under the collateral order doctrine. However, I mean, I can understand why the court might deem it to be that Mr. Cashin has waived his rights. We didn't come into the case to protect Mr. Cashin's rights. We came into the case to defend the determination of the United States. But like I said, if the court is not inclined to reach that issue, we take no position on that. But on the merits of the case itself, I'd be happy to talk about why we think the certification — All right. How do you get around a business purpose, which is defined as any transportation is considered business use? Any transportation in an official vehicle is considered business use. Well, you ask him to get out of his official vehicle and into his private vehicle for the benefit of the government. Well, Your Honor, I mean, the way we look — the way we look at it is the way you would look at it. I mean, there are plenty of officials in Washington, D.C. who have their own cars and drivers, and for any number of reasons — And when you get into your private vehicle, you're out scout in terms of the protection that you're afforded in this section that I just read? Well, yes and no. I mean, he says that — I mean, the FAM also says — what I mean is the Federal Foreign Affairs Manual says that you're required to get your own personal liability insurance for use of your personal vehicle. Mr. Kent says that he was misinformed by someone at the embassy about that. That's not inconsistent with its business use, all transportation, any transportation. But it also says that you can use your personal vehicle for business use. You have to get authorization to do that and get reimbursed for mileage and stuff like that. That wasn't done here. Yes, it did. I think there's no evidence that he did. I mean — but he does say that he was asked to do that, which is fine, but that doesn't — we don't think that sort of an effort to save — to minimize use of the government vehicle renders every time he's driving his own car with his — It's not a good idea to do the government a favor. Right. Well — And now everybody is saying, forget your private vehicle stuff. We want the protection that we're provided for — that this has given us in this Foreign Affairs Manual. Well, Your Honor, I mean, I think the first principle you need to start with in this case is the coming and going rule, which is recognized in every jurisdiction, including California, under the restatement, which provides that when an employee is coming or going to work in their personal vehicle, they're not engaged — they're not acting in the scope of their employment. And, yes, there are exceptions to that rule. Do you see that in this manual? Well, I mean, I think the provision of the manual just makes clear that — I mean, the provision of the manual justifies the availability for him of a car and driver at all times. It doesn't render the fact — I mean, if he was driving his child to a soccer game or something like that, that wouldn't be within the scope of his employment simply because he had a driver he could have had do the job. The driver would have been within the scope of his employment because his job was to drive Mr. Kent around. Any transportation is considered business use because these officers are considered  Well, that's right. But all Foreign Service employees are considered to be 24 — on duty 24 hours a day, 7 days a week, for certain purposes, not — Where does it say transportation in a government vehicle? If you look at — I don't know that — I couldn't find — when I was just flipping around, I couldn't find it in the executive record, but it is attached to the amicus brief in this case. Okay. That's fine. That's what I was — The green amicus brief? Yes, exactly. In appendix A to that — Appendix A? They have six — if you look at 6 FAM 228.2-1, which is on page 57 of 76, and then if you turn the page — Hold on. Hold on one second. It's — where's appendix A? It's the first one after the — it's very long. Appendix A? All right. Now, what am I looking for? And then if you sort of flip ahead to —  Appendix A, what page? Well, it says page 57 of 76. I don't — I have page 1 of 10. Keep going, because they seem to just have a whole bunch of things attached together. And it's when they have the citations to the six foreign affairs — first they go through provisions of — My brief doesn't have anything that says 57 of 76. Does yours? Yeah. What do you got? I'm sorry. It's — Are we 6 FAM 228.2-1? 228.10. And then on the next — yes. I'm sorry. 228.2-1. And then on the next page, 228-.10. Oh, there it is. See, and the first one says, may be used for the following business purposes. Where's the one that says any transportation 24 hours? Well, that's — it's subhead 1 under that provision, which is clearly relating only to official vehicles. I don't see how 228.10 helps your case. Well, our only point, Your Honor, is that this is all referring to, you know, official vehicles, which Mr. Kent had. But that's not what was going on here. Here he was driving his personal vehicle, which — But that's because — but it says — Right. I understand that it was at least in part to benefit the employees. No, no, but it says that you can use an official vehicle any time for any purpose because those trips are always for official business. Yeah, that is the reasoning they give. But we don't — but we think if you read the Foreign Affairs Manual as a whole, it doesn't say that for all purposes and for all determinations, a senior foreigner, someone who's entitled to a car, is actually working at all times. And that's the inquiry that we're engaged in here. Was he actually working when this accident occurred? What's really going on here? Yeah, I know. I was just going to ask the same question. He really — I mean, we looked at the cases, and we think this is the right answer. But your top — see, what troubles me about this is that this — Mr. Kent was your top diplomatic official in this region. And when the accident occurred, he was immunized from sort of the Russian authorities, you know, any sort of criminal or — immediately. I mean, he didn't have to take a blood test. And so for the purpose of your relationship, the government's relationship with the foreign state, he enjoyed absolute immunity, coextensive with the U.S. government. But you turn around here and say that he was outside of his employment when the suit comes to California. Well, we think they're two different inquiries. I mean, one question of, you know, the scope of his consular immunity is a question that has to do with the treaties and the United States' relationship with the foreign power. But why wouldn't it — I mean, in election — I mean, what is the difference? The difference is that the question is a different one. The question for a scope certification, the question we've been directed to look at, is whether at the time of the accident the employee in question was working. The Clamour case out of this Court, I think, makes that very clear. There you had a government employee, a military — they were working on a military base, but they were a non-military employee, had been on temporary duty in Hawaii, had to stay off the base because there was nowhere else for him to stay, in a room paid for by the government, with a rental car paid for by the government. He's driving off the base to go directly to the motel where he was staying after working all day. And the Court said — and he was in a car accident, and the Court said that's not within the scope because he was just driving — he was driving home at the time of the accident, even though he wouldn't have been there if he wasn't working for the United States. The only reason he was in that car at all is because he was working for the United States, and it's a convenience to them, but he was not within the scope of his employment. If you continue to win, what's the practical effect of this for the other side? The practical effect for the other side is he would be — remain a defendant in this lawsuit. And what would happen then, I don't know. And how is that in your interest? We don't — it's not in our interest, one way or the other, Your Honor. I mean, we really try to make the scope — Cutting them loose. We try to make the scope determination based on our understanding of the law. This is where sometimes our training as lawyers to make distinctions gets us in trouble. You know, I mean, basically we just looked at the cases and made the determination we thought was best. And we thought, based on the fact that he was driving in his personal vehicle after hours on his way home from the gym, he wasn't working. Therefore, he was not within the scope under the relevant law. But a gym is the turning back — the turning — No, I mean, it's not, because under the coming and going rule, it would be the same either way. But the gym has nothing to do with this. We can take the gym out of our analysis. Well, I think the gym sort of drives the point home. Take a point. I mean, take a position. Is it — I mean, I'm trying to sort of figure out, where's the line drawing here? Does the gym make a difference? The question is, was he involved — was he engaging in his personal business or was he engaged in business for the United States? So it's just plain old coming and going, he's out. That's right, Your Honor. In his personal vehicle. I know he's working 24-7 in all transportation, the business transportation. But because he's not in official vehicle anymore, he's in the vehicle that the State Department asked him to substitute for his official vehicle for official work. Right. Now, the — if he were in his official vehicle and he caused a tort somehow while he was being transported from somebody else, while he was not working, he probably would not be within the scope. Well, if he were driving the official vehicle, he could drive it. He doesn't have — maybe he would make the mistake of being nice enough and saying, I don't want to make you pay for a chauffeur, I'll drive it. So if he were driving the official vehicle, would he be covered? That might make a difference, Your Honor. I actually hadn't thought of that. I mean, and I want to say one other thing about the Clamour case, which I think is, you know, very important to this case. In that case, there is some dicta that we note in our brief that says, you know, we might reach a different result if he was on call 24-7 or working until his head hit the pillow. But the case that is cited in that — for that little statement of dicta, leaving open that issue, is the Garcia case out of the Fifth Circuit, in which the Fifth Circuit, again, held that an EPA investigator who was working until his head hit the pillow 24-7 on an investigation was not within the scope when he was driving home from a bar, because that night, even though he had been working around the clock, he had stopped work for the evening. So they looked at what he was doing at that particular time, and they said not within the scope. Again, he was driving a vehicle that was rented to him by the government, et cetera, et cetera. Who actually made this decision? The Director of the Torts Branch made the decision. Of what? Of the Torts Branch of the Department of Justice, which is delegated by the Attorney General. It can either be a U.S. Attorney or it can be a Director of the Torts Branch. And the State Department was involved in this decision, then? Well, if you look at the regulations that govern scope determinations, you can look at it if you're interested in 28 CFR Section 15, provide that the way it's supposed to work is that the employee is supposed to contact his employing agency, which in this case would be the State Department, which then makes a recommendation to the Department of Justice. But the Department of Justice has the final word on whether or not it's. What was the State Department's recommendation? Well, we actually – that information is privileged. But that's why there's de novo review of this. I mean, the whole idea is that there's – because it's a work product. Classified, right? I don't think so. I don't think I'm allowed to sort of give that information. I'm not actually sure. But the point is that that's why you have de novo review, because there is, as the Supreme Court said in the Limogno case. Could we find out from the Vice President? Can we get Condoleezza Rice to give us some information on this? I think it's best for me to say nothing, Your Honor. But I assume we could – I just don't know. Would you tell a grand jury? I just – I'm sorry, Your Honor. I'm just not sure how I'm supposed to answer the question, so I'd rather not. Does the State have any official – Department of State have any official position regarding negligence for – I mean, tort liability for its employees who are working 24-7 overseas? Doesn't it have any official position that might not relate directly to Mr. Kent's case? Well, I don't know about an official position, Your Honor. But I think its view is when they're working, they're within the scope, and when they're not, they're not. When they're coming and going, they're not. I think that's right, Your Honor. Although, I mean, I don't know that that's the official position of the Department of State, but that's the position I was authorized to give in this particular case. And who are you authorized by? By the Department of Justice. But you're not the Department of State. No, I'm not the Department of State. But, you know, this is – but, you know, we think it's – we think it accords with all the law on this issue. I mean, the military – people in the military are subject – I mean, the other point they make a big point of is that he was subject to discipline. He was on call 24-7. He was subject to discipline at all times. That's also true of members of the military. And, again, the cases are when they're just driving to or from work, when they're not sort of doing a job that they're required to do by their employer, they're not within the scope of their employment. What about the soldiers in Iraq? Are they – I mean, if they were driving around Baghdad and got in an accident, would the military – I mean, would they be subject to suit here and the government wouldn't say it was within the scope? I – well, the Military Claims Act, of course, they have their own – I mean, I don't know the answer to that, Your Honor. How do you distinguish Wilkinson versus the United States? Wilkinson. Could you remind me which one that is? Well, that's a member of the Navy, found to be operating within the scope of his employment. He was driving a rental car from Boston to Norfolk to pick up and deliver items. And an accident occurred when he finished his work for the day and was driving back to his hotel room, coming and going, intending to stop first for dinner. Right. But I think that was different, Your Honor, because the only reason he was driving it – driving was because they had instructed him to go and pick up the things and bring them where he was going. When did he finish his work for the day? Where did he go? The exceptions to the – I mean, the exceptions to the coming and going rule are if you're on a special errand for your employer, which I think is the one that applied in Wilkinson. If you are in a – I have a nice little cheat sheet on this. If you're called in at an unusual time, specifically to work. If you're going on an unusual – if you have a business reason to go to a location other than your regular place of employment or, in some states, if you're driving the employer's vehicle. Here we didn't have any of those. And that's why we think it was not within the scope of the employment. And clamor upon which you rely. Nobody was on duty 24-7. Well, he was – that's right, Your Honor. Nobody was on duty 24-7 in that case. However, I mean, the other thing we cite – we cite a bunch of cases in our brief also under California law, which also makes clear that just because you're on duty 24-7 doesn't mean that you're within the scope. Does the Department of State or the Department of – do the respective departments really want a presidential opinion on this from a circuit? I mean, do you really want us to – I mean, we could go against you. Is that something the government really wants us to issue? We have to publish. It would be good for the government if we got an opinion that said we protected your consular officials. I mean, isn't that what they would want? I mean, that's what I'm getting at. We just – I mean, all I can say, Your Honor, is we applied the test as well as we could and did what we think is the correct result under the applicable standard. If we tell you you can give more protection to the people you hire, maybe you'd be happy with that result, even if it's not the one you're urging. The government might like that kind of a result. It would tell them that the consular officials that you really do stand behind them instead of throwing them to the wolves. That would be a bad decision for the government. Well, you know, the government also has an interest in having its employees maintain more responsibility for their own actions, of course. But, you know, in general, of course, any decision the Court makes, we would – You'd be happy with it. We'd respect and follow. We would ask that the Court affirm the district court's well-reasoned decision. Thank you very much. Thank you. You've had an extra 10 minutes. We'll give you 30 seconds. Your Honor, there are two things that I believe are really going on here. Number one, the Department of State would like this Court to do its work for it by reversing the matter, and they can throw their hands up and not have to face the music in Russia where they say, you're protecting this neo-Nazi. That's good for you, right? Do you have any objection to that? They don't have any objection to Your Honor reversing this case. All right, then, fine. Okay. The other thing, though, is it is happening, and I don't know what Your Honor is going to talk about in your conference, but we tried to find out the answer to the questions you've asked. We met with the Undersecretary of State in charge of this stuff, and they won't tell us, and so one needs to infer that maybe this has to do with overtime and pension. Thank you very much. The case just argued will be submitted. The Court will take a brief recess before the final argument of the morning. All rise.
judges: Reinhardt, Trott, Wardlaw